FLORENCE TINSMAN, Appellee, *vs.* THE ILLINOIS COMMER-
CIAL MEN'S ASSOCIATION, Appellant.

*Opinion filed October 26, 1908.*

INSURANCE—*whether insured acted with ordinary care is ques-
tion for the jury.* In an action on an accident policy insuring a
person who met his death by drowning when attempting to cross
a river on a cable ferry, the question whether he was exercising
due diligence for his safety is one of fact for the jury, where the
facts and circumstances in evidence are not such that all reason-
able minds would necessarily agree that an ordinarily prudent man
would not at that time have tried to cross.

APPEAL from the Appellate Court for the First Dis-
trict;—heard in that court on appeal from the Superior
Court of Cook county; the Hon. ROBERT W. WRIGHT,
Judge, presiding.

JAMES MAHER, for appellant.

DOUGLAS C. GREGG, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

This appeal is from the affirmance by the Appellate
Court of a judgment rendered upon a policy of insurance
against accidental injury or death. Frederick Tinsman, the
assured, was drowned on May 15, 1904, and the defense
was based upon a by-law of appellant which provides that
the association shall not be liable for any injury or death
resulting from an accident to a member which happened
while he was violating any law or was not in the exercise
of due diligence for his self-protection or was under the
influence of intoxicating liquors, appellant insisting that the
assured was not, at the time of his death, in the exercise of
due diligence for his self-protection.

There is evidence tending to show the following facts:
Frederick W. Tinsman, who was about thirty years of age
and unmarried, was the president of the Chicago Art Com-

pany. On March 23, 1904, he left Chicago in company with Charles Dunlap, and on May 13 they camped at Laughton Springs, an amusement resort on the north side of the Truckee river, in Washoe county, Nevada, about five miles west of the city of Reno. Dunlap had taken the tent and camping supplies out from Reno and had been there several days before he was joined by Tinsman. The river at this point was about two hundred feet wide and was normally six or seven feet deep, but varied in size according to the melting snow in the mountains. There was no bridge across it nearer than a mile and a half, but at low stages of the water there was a wagon ford about six hundred feet from the camping grounds. Laughton, who owned the grounds on both sides of the river, resided there and had a bar-room and other buildings located near this place. When the river was too high to be forded a trolley cable ferry was used, which had been in existence for twelve or thirteen years. It consisted of a car suspended between two wire cables, about two hundred feet long, strung across the river. On one side of the river the cables were fastened by bolts drilled into a rock on the bank, and on the other side they were fastened to a wooden structure loaded down with stones. The car consisted of a platform about ten feet long and four feet wide, with cross-pieces four by four inches at each end. On each side of the car were two pulleys through which the cables passed, and the car swung between the cables, which were about four feet apart. The bottom of the car was from four to eight inches below the cables. When the river was at its normal height the car was about six feet above the water. It was operated by loosening the car from its fastenings and allowing it to run by its own weight on the sagging cables to the middle of the river, and was then pulled hand over hand up the inclined cables to the opposite bank. At the middle of the river the car, in an average stage of the water, would be at least three or four feet above the surface of the river. On Sunday,

May 15, the river had been rising for two or three days and was perhaps higher than it had ever been before. During the forenoon two boys had crossed on the car and a little later three others crossed. Between one and two o'clock in the afternoon, Tinsman, Mrs. Ede, a young man named Jacobs and a young woman named McMillan, all of whom except Tinsman lived in Reno, went to the car. Tinsman untied it and got in with Mrs. Ede. Jacobs followed, and after some reluctance Miss McMillan also got in. The car was released and it ran down the cables toward the middle of the river. The cables sagged so that the car was struck by the rapidly flowing current, and it was broken and its occupants were all swept into the river and drowned.

The question as to whether or not, under the circumstances, Tinsman was in the exercise of due diligence for his self-protection was a question of fact for the jury. There can be no doubt but that the river was high and the current swift and that it was dangerous to cross, but the ferry was constructed for use when the river was high and swift and when it could not be forded. It is true that it was constructed primarily for the private use of Laughton and his family and employees, but it was also used by the guests of the resort and other persons. The evidence is in direct conflict as to deceased's having been warned of the dangerous condition of the river and whether any notice had been posted around the landing notifying persons not to use the ferry. The deceased was a stranger and was not acquainted with the rapid changes in the river. He had been there but two days, and during that time he had seen the ferry used on several occasions. In fact, it had been used twice that day a short time before the accident. Three boys had passed over in safety, and it might well be that the circumstances did not indicate to the deceased that he could not do the same thing. The evidence shows that the capacity of the car was seven hundred pounds and that the four persons who occupied it did not weigh to exceed six hun-

dred pounds. The fact that the boys crossed in safety was probably due to their light weight, or the river may have risen in the interval. It cannot be said that an ordinarily prudent person, under the circumstances, would have necessarily appreciated that an attempt to cross the river would be attended with serious danger to life. Three of the persons who met their death with deceased lived in the immediate vicinity, and one of them had lived there all his life and was familiar with the ferry. He evidently did not consider it dangerous or he would not have ventured to cross. All of the parties had equal opportunity with deceased to know from observation the conditions, and they apparently did not consider them so dangerous as to make it imprudent to try to cross, otherwise we must say that they willfully risked their lives. Other visitors and persons living in the neighborhood saw the deceased get into the car and knew that he was attempting to cross the river, and they offered no warning or protest. The only reasonable explanation of this is that they did not consider it dangerous to life or they would have warned him. The hazardous nature of deceased's attempt is now apparent, but it cannot be said from this evidence that all reasonable minds must agree that a reasonably prudent man would not at that time have tried to cross the river. That was a question to be determined from a consideration of all the circumstances of the case, and the refusal of the trial court to direct a verdict for the defendant was not error.

The objections to the instructions given at the request of the appellee are not valid. The requirement of due diligence for his self-protection contained in the second instruction cannot be regarded as applying only to the time the assured was in the river, but covers the whole period of the events leading up to and attending the drowning. The third instruction, in reference to the measure of due diligence, uses the word "might" where counsel thinks the word "would" was required, but we do not agree with his

criticism. The measure of prudence is not necessarily what an ordinarily prudent person would do. That cannot always be told. Different persons may adopt different courses of action under like circumstances and yet all act with due diligence for their self-protection. Whatever a person in the exercise of reasonable care might do is within the limits of due diligence. The first refused instruction is covered by the sixth given at the request of the defendant. The refusal of the fifth was manifestly proper. The first clause is a peremptory declaration that the plaintiff cannot recover under the evidence, and we have held that the evidence required the submission of the case to the jury. The second, third and fourth refused instructions were on the question of due diligence and were covered by instructions 6 and 10 given. The instruction as to the burden of proof was more favorable to the appellant than it was entitled to.

The appellant's assignments of error are not sustained, and the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*